Brian S. King, #4610
Nediha Hadzikadunic, #15851
**BRIAN S. KING PC**
336 South 300 East, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| DAVID K., KATHLEEN K., and AMY K.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH and ALCATEL-LUCENT MEDICAL EXPENSE PLAN for ACTIVE MANAGEMENT EMPLOYEES<br><br>Defendants. | COMPLAINT<br><br>Civil No. 2:17-cv-01328 DBP |

Plaintiffs David K. ("David"), Kathleen K. ("Kathleen"), and Amy K. ("Amy) through their undersigned counsel, complain and allege against United Behavioral Health ("UBH"), and Alcatel-Lucent Medical Expense Plan for Active Management Employees ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. David and Kathleen are natural persons residing in Collin County, Texas.

2. David was employed by Alcatel-Lucent, which was a global telecommunications company based out of Boulogne-Billancourt, France. In November of 2016, Alcatel-Lucent was acquired by Nokia.

3. The Plan covering David and Amy is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 et. seq., of the Employee Retirement Income Security Act of

1974 ("ERISA"). David was a participant in the Plan, and Amy was a beneficiary.

4. UBH, which operates at times under the Optum brand name, is an insurance company headquartered in Hennepin County, Minnesota. UBH provides insurance and third party administrative services to a variety of individuals and businesses across the United States.

5. UBH is the third party claims administrator for the Plan.

6. Amy received medical care and treatment in Utah at Discovery Ranch for Girls ("Discovery"). Discovery is a licensed health care provider in the State of Utah and provides residential treatment for adolescent girls with mental health conditions.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because UBH has a claim processing center in Utah and Amy's treatment was provided in Utah.

9. The remedies that David and Kathleen seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan and pursuant to 29 U.S.C. § 1132(a)(1)(B), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## BACKGROUND FACTS

### **Amy's History and** Treatment

10. Amy was born to a 16 year old mother who gave her up for adoption. David and Kathleen adopted Amy when she was five weeks old. She met all developmental milestones.

11. Amy was a loving and happy child but was always very sensitive, shy, and introspective. Amy treated briefly with a therapist when she was seven years old in connection with emotional outbursts.

12. Shortly before she was to start sixth grade, Amy's birth father initiated a search for her. He threatened the adoption agency and involved law enforcement in the search. David and Kathleen were concerned about the possibility of the birth father finding them and believed that it was necessary to explain the situation to Amy. David and Kathleen took Amy to a therapist for assistance in processing the information about her biological father.

13. As her sixth grade year progressed, Amy became depressed. She broke her leg at a school function and had to drop her activities with the swim team and this added to her depression.

14. Acceptance and approval of friends became increasingly important to Amy and she often did things she wouldn't otherwise have done in order to get attention. Amy was engaging in high-risk behaviors on the internet, participating in sexually charged chats with strangers. Amy didn't understand the implications of her conversations.

15. Amy asked her parents if they thought she had attention deficit/hyperactivity disorder ("ADHD"). While surprised at the question, David and Kathleen took advantage of the opportunity to have a psychological evaluation done for Amy. She was diagnosed with ADHD as well as depression and anxiety and the psychologist recommended therapy to address Amy's conditions.

16. Amy began therapy and was taking antidepressant medication but her condition did not improve. As a result, David and Kathleen discontinued Amy's therapy.

17. Amy began cutting herself and when David and Kathleen questioned a cut on her arm, Amy insisted that she had been scratched by a cat. A subsequent cut, serious enough to require medical attention, forced Amy to confess her self-harm.

18. Amy began treating with a new therapist but did not reveal that she was experiencing suicidal ideation. Amy cut one of her wrists and was admitted to the hospital.

19. Over the next almost two years, Amy had eleven emergency room visits, 5 inpatient hospitalizations for a total of fifty-eight days, participated in intensive outpatient and partial hospitalization treatment programs, and had four periods of residential treatment. During this time, Amy continued to see her outpatient therapist as well, along with participating in group and family therapy sessions.

20. UBH, as agent for the Plan, denied additional coverage for one of Amy's recommended residential stays and she was discharged from the facility. Three days later, she was admitted to the hospital for self-harm.

21. Amy's treatment team continued to strongly recommend a more intensive long-term residential program for her. David and Kathleen retained an educational consultant to assist them in locating an appropriate program.

22. David and Kathleen submitted requests to the Plan for authorization of treatment at two potential programs. The requests were reviewed by a third party reviewer, IPRO, which approved 90 days of treatment, to be followed by a clinical review after that time to further evaluate the need for ongoing treatment. On January 28, 2014, Kathleen received a letter from IPRO denying further coverage after the 90 day period lapsed on February 01, 2014.

23. On November 4, 2013, Amy was admitted to Discovery. Dr. Jane Miles at Discovery noted:

> Amy historically improves while in the residential treatment milieu, but she continues to show emotional reactivity that places her at ongoing risk of relapse when she is discharged to home. She is precariously balanced and quickly regresses to suicidal thoughts and/or behaviors when not in a monitored 24 hour therapeutic setting. She has struggled to make the needed progress to be successful at home with multiple shorter-term residential stays. It is recommended that she needs a single, consistent program that will keep with her until she can develop the needed skills to be safe. Processing does occur with Amy, and therefore she is able to make progress, but her speed of this processing is much slower than her peer group, causing her to lose many of the important elements of the treatment process. This will make many of the processes seem slower and ineffective, when really she needs a greater length of time to allow these skills to be developed.

24. On February 6, 2014, UBH sent David and Kathleen a letter denying any payments for Amy's treatment at Discovery from February 9, 2014 forward. UBH claimed that Amy's Long Term Residential treatment at Discovery was denied for several reasons: 1) the treatment was not consistent with standards of care; 2) the treatment was experimental; 3) the treatment was not clinically appropriate for Amy's conditions; and 4) educational/behavioral services focused on skill building and communication, social interactions, and learning were not a covered benefit under the Plan.

25. Kathleen contacted UBH on March 20, 2014, to request additional information regarding which specific provision of the Plan UBH was relying on to deny Amy's treatment.

26. Kathleen received the following: "Contact Summary: Per email communication with CA Jennifer D and supervisor William J. The section of the SPD that is most closely related to the exclusions noted in Ibaag is found on page 81 of the Alcatel Lucent SPD which states: 'Alternative treatment facilities accessed or provided Out-of-Network' is excluded." Kathleen remarked that this denial rationale from the internal Utilization Review notes was inconsistent with the denial rationale discussed in the February 6, 2014 letter from UBH.

27. On June 25, 2014, Kathleen asked for a level 1 appeal of the denial of Amy's treatment at Discovery. She requested that Amy's treatment be approved and informed UBH that Amy was still being treated at Discovery. Kathleen argued that nothing in the Plan limited coverage at a residential treatment facility if the care was medically necessary.

28. Kathleen further stated that the provision excluding Out-of-Network alternative treatment facilities had been deleted in its entirety by a 2010 amendment to the Plan, after the passage of the Mental Health Parity Addictions Equity Act. UBH was relying on a section of the Plan that had not been in effect for 4 years as a justification of its denial.

29. On August 1, 2014, UBH sent Kathleen a letter reaffirming the denial of Amy's care. The reasons for the denial were quoted verbatim from the February 6, 2014 denial letter, and did not address any of the issues or arguments Kathleen had brought up in her appeal.

30. On September 25, 2014, Kathleen sent UBH a letter requesting a level 2 appeal of UBH's denial. Kathleen expressed frustration that UBH had failed to address her concerns in its August 1, 2014 denial. She also questioned how or why the language in both denial letters was the same, word for word, despite the fact that a different individual had conducted each review. Kathleen argued that these problems indicated a failure to provide her with the "full, fair, and thorough" review required by ERISA.

31. Kathleen reiterated her concern that UBH had denied coverage based on outdated language excluding care that was no longer found in the Plan. She argued that, so long as medical necessity existed, the Plan contained no exclusions for care in residential treatment settings and had no restrictions or exclusions regarding long-

term care. Rather, the Plan explicitly allowed “unlimited mental health benefits if the services are medically necessary.” Kathleen once again stated that the reason for denial that UBH had given to her from its Utilization Review notes was not consistent with the reasons for denial contained in the February 6, 2014 and August 1, 2014 letters.

32. Kathleen requested that UBH address her concerns in its response.

33. On November 10, 2014, Amy completed her treatment at Discovery and was discharged.

34. On December 10, 2014, UBH sent Kathleen a letter denying her second appeal. In this letter, UBH maintained the denial of Amy’s treatment at Discovery, but cited a new reason for doing so. UBH claimed that medical necessity was not met. As a result, Amy's care was considered custodial and was therefore not covered.

35. UBH said that Optum’s Level of Care Guidelines require a patient to be seen by a physician twice a week, but that Amy was only being seen by a psychiatrist once a month. UBH alleged that Amy’s symptoms were in remission, and that since UBH had found no evidence that Amy was actively self-harming, she did not meet the qualifications for care in a residential treatment setting. UBH also claimed that an active treatment plan was required, but that Discovery failed to update Amy’s treatment plan throughout the course of her treatment.

36. UBH claimed that Amy was primarily being treated at Discovery for personality issues, which could be appropriately treated at a lower level of care. In its denial letter, UBH defined personality issues as “[P]roblems with rejection, sensitivity, identity, self-esteem, appropriate communication and so on.”

37. Kathleen submitted a second request for level two appeal on February 5, 2015. She noted that a *second* level two appeal was appropriate because UBH had changed the basis for denial since she had submitted the previous appeal and she was entitled to address the latest basis for denial.

38. Kathleen discussed the criteria in detail and argued both that Amy met the criteria and that UBH's insistence that Amy be actively self-harming was contradictory to the criteria for residential treatment. Kathleen included a chronological history of Amy's development and treatment history, cited to specific therapeutic notes to demonstrate that she met UBH's guidelines, and included up-to-date medical records.

39. On March 6, 2015, UBH responded to David and Kathleen and maintained its denial, relying on the same reasons it had included in its December 10, 2014 denial.

40. On August 31, 2015, David and Kathleen requested an external review of UBH's denial of treatment at Discovery.

41. Kathleen cited UBH's March 6, 2014, denial letter which claimed that Amy's care was not medically necessary. First, she stated that UBH listed Amy's coverage as ending on January 31, 2014, when the actual last covered day was February 8, 2014.

42. She reiterated that although she had made several appeals, UBH had still made no effort to address a single one of her concerns. She argued that UBH's failure to respond to her arguments was evidence that a full, fair, and thorough review, had not been done.

43. Kathleen disputed UBH's claim in its final denial that medical necessity was not met from February 9, 2014, forward by citing the following July 29, 2014 case note by Dr. Mitchell Kho, one of the doctors UBH relied upon to come to its decision to deny care. Dr. Kho stated in regards to Amy's level one member appeal, "Pt does meet for

continued mh-RTC loc; but long term residential care as defined below is not a covered service." Kathleen stated that Dr. Kho's determination that Amy qualified for residential treatment care was in line with Discovery's initial review conducted by Jennifer Dunning, LPC.

44. Kathleen reiterated that the portion of the summary plan description that Dr. Kho had cited to show that long term residential treatment was not covered under the terms of the Plan, was no longer in effect after it was removed by a January 1, 2010 amendment to the Plan.

45. Kathleen quoted UBH associate medical director Dr. Lawrence Baker's case notes from October 23, 2014, which stated, "The patient remains in the facility. The patient's mother provided documentation, which supports her contention that that [sic] RTC is NOT excluded." (Emphasis in original)

46. Kathleen argued that when UBH denied Amy's treatment for not meeting its Level of Care Guidelines due to Amy only seeing a psychiatrist once a month and not twice a week, that UBH acted in an arbitrary and capricious manner. She said that if the services provided at Discovery were not acceptable to UBH, that UBH would not have approved and paid for her initial treatment there. In fact, UBH approved 97 days of Amy's treatment at Discovery before denying further care after February 9, 2014. This, Kathleen argued, defeated any and all complaints raised by UBH after the fact about the alleged inadequacies of care of Discovery. Kathleen stated that Discovery met all of the qualifications required of a residential treatment facility as set forth in the Plan.

47. Kathleen rejected Dr. Manning's assertion that Amy's care had become custodial. Kathleen claimed that nowhere in the Plan was residential treatment for mental health disorders considered a custodial level of care.

48. Kathleen also argued that using the Level of Care Guidelines as a basis to deny treatment was inconsistent with the Guidelines' purpose. She then quoted the UBH website,

> The Level of Care Guidelines is used flexibly, and is intended to augment- but not replace- sound clinical judgment. Use is informed by the unique aspects of the case, the member's benefit plan, services the provider can offer to meet the member's immediate needs and preferences, alternatives that exist in the service 2015 Level of Care Guidelines system to meet those needs, and the member's broader recovery, resiliency and wellbeing goals. Exceptions may be made to the Level of Care Guidelines such as when there is a superseding contractual requirement or regulation, or when a Medical Director authorizes a case-specific exception from using evidence-based treatment when the member's condition has not responded to treatment as anticipated.

49. Kathleen argued that during the time Amy was at Discovery, UBH had a Single Case Agreement in effect with Discovery. Kathleen said that she had no reason to expect that UBH would deny coverage with regards to Amy's treatment at Discovery when Discovery and UBH had a standing contractual agreement.

50. On November 5, 2015, UBH upheld the denial of Amy's treatment at Discovery based on an external review from MCMC. The external reviewer from MCMC, identified as reviewer 32041, said that they had examined the appeal information, denial letter, correspondence, submitted medical information, and the Summary Plan Description, and after reviewing these documents, had deemed Amy's care as "not medically necessary as defined by the Summary Plan Description."

51. Kathleen exhausted her pre-litigation appeal obligations under the terms of the Plan and ERISA.

52. Kathleen has paid out of her own pocket over $87,000 for Amy's treatment at Discovery.

**CAUSE OF ACTION**
**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

53. ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon plan fiduciaries such as UBH, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

54. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1133(2).

55. The Defendants breached their fiduciary duties to David, Kathleen, and Amy when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in the interest, and for the exclusive purpose of providing benefits to, ERISA participants and beneficiaries and to provide a full and fair review of Kathleen's claims.

56. The actions of UBH in failing to provide coverage for Amy's medically necessary treatment at Discovery are a violation of the terms of the Plan and UBH's medical necessity criteria.

57. The actions of UBH in failing to provide consistent bases for denial during the appeal process is a violation of ERISA's claims procedure regulations and the terms of the Plan.

58. The actions of the Defendants, as outlined above, have caused damage to David and Kathleen, in the form of denial of payment for medical services rendered to Amy in an amount exceeding $87,000.00.

59. The Defendants are responsible to pay Amy's medical expenses as benefits due under the terms of the Plan together with prejudgment interest pursuant to U.C.A. §15-1-1, attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the full amount under the terms of the Plan that is owed for Amy's medically necessary treatment at Discovery, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this 29th day of December, 2017.

/s/ Brian S. King
Brian S. King
Attorney for Plaintiff

Plaintiffs' Address:
Collin County, Texas